**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ANA MARIA A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:17-CV-2715-BH |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

By consent of the parties and the order of transfer dated December 12, 2017 (doc. 14), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND[1]

Ana Maria A. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  (*See* docs. 1; 17.)

### A.    Procedural History

On February 18, 2014, Plaintiff filed her application for DIB, alleging disability beginning on January 16, 2014.  (R. at 172-75.)  Her claim was denied initially on July 7, 2014, and upon reconsideration on February 10, 2015.  (R. at 89, 97.)  On March 2, 2015, Plaintiff requested a

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

hearing before an Administrative Law Judge (ALJ). (R. at 101-02.) She appeared and testified at a hearing on May 11, 2016. (R. at 31-58.) On June 23, 2016, the ALJ issued a decision finding her not disabled and denying her claim for benefits. (R. at 10-30.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on August 22, 2016. (R. at 169-71.) The Appeals Council denied her request for review on August 4, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

B.    **Factual History**

   1.    **Age, Education, and Work Experience**

Plaintiff was born on January 16, 1972, and was 44 years old at the time of the hearing. (R. at 36, 172.) She had a limited education and could communicate in English. (R. at 37.) She had past relevant work experience as an apartment manager, warehouse worker, and billing coordinator. (R. at 37-38.)

   2.    **Medical Evidence**

On February 12, 2013, Plaintiff presented to Family Care Medical Center (FCMC) complaining of chest pain, left arm pain, vomiting, and bilateral burning pain in the hands. (R. at 262.) She was assessed with chest pain and shortness of breath and was transported via ambulance to the emergency room (ER). (R. at 263.)

On February 25, 2013, Plaintiff returned to FCMC for a follow-up visit and was examined by Dr. Fuentes Guillermo, D.O. (R. at 260.) He noted that her prior primary care physician had diagnosed her with Lupus, but Plaintiff was unable to obtain her medical records because the physician moved out of state. (*Id.*) She was assessed with hypertension and Lupus. (*Id.*)

On March 11, 2013, Plaintiff presented to Dr. Guillermo for fatigue, hand pain, and back pain. (R. at 258.) She reported pain in the mid thoracic left paravertebral region of the back that worsened when she laid on her left side. (*Id.*) She also reported coughing and being congested for several days. (*Id.*) Her physical examination was remarkable for back tenderness on palpation, but her range of motion was intact. (*Id.*) She was assessed with bronchitis and lumbago. (*Id.*)

On September 11, 2013, Plaintiff presented to Baylor Medical Center (Baylor) complaining of dizziness, nausea, and ringing pressure in her ears, which she described as constant and severe. (R. at 273-84.) She appeared uncomfortable but not in apparent distress. (R. at 274.) She denied experiencing depression or suicidal ideation. (*Id.*) Her vital signs were normal. (*Id.*) An MRI of her brain showed Chiari malformation with tonsillar ectopia, (R. at 283), while an MRI of her neck revealed no acute abnormalities, (R. at 282). She was diagnosed with dizziness – vertigo and was issued a 3-day work release form. (R. at 280.)

On December 30, 2013, Plaintiff went to Family Medical Clinic of South Irving (FMCSI) for low back pain, shortness of breath, and headache. (R. at 292.) She reported numbness in her face, both arms, and right foot. (R. at 293.) She was diagnosed with Systemic Lupus Erythematosus (SLE) and syringohydromyelia, and referred to a neurologist and psychiatrist. (R. at 292.)

On January 6, 2014, Plaintiff returned to FMCSI, complaining of a cough. (R. at 290.) She was issued a doctor's note stating that she was medically unable to perform full-time job duties due to uncontrolled Lupus and seizure activity. (R. at 286.) She visited FMCSI again on January 15, 2014, complaining of a Lupus flare-up. (R. at 287.) She also reported experiencing seizures at night, which caused her tinnitus and pain in both ears. (*Id.*) A physical examination revealed tenderness of the neck. (*Id.*) She was diagnosed with Lupus, Chiari malformation, and seizure disorder. (*Id.*).

On April 29, 2014, Plaintiff went to Parkland Hospital (Parkland) for headache, shortness of breath, nausea, numbness around her lips, and chest pain radiating to her left arm. (R. at 366.) Her mood and affect were normal and she was not in any distress. (*Id.*) She was diagnosed with headaches and chest pain, and prescribed Losartan, Phenytoin, and Prednisone. (R. at 372-73.)

On May 5, 2014, Plaintiff returned to FMCSI for a follow-up visit and was diagnosed with depression, hypertension, and seizures. (R. at 340.)

On May 27, 2014, Plaintiff underwent a physical consultative examination with Dr. Mahmood Panjwani, M.D., P.A., for lupus/arthritis with joint and lower back pain, seizures, and numbness. (R. at 374-79.) Dr. Panjwani noted that Plaintiff had been developing joint pains and low back pain, which had caused her "increasingly more discomfort, pain and limitations" over the years. (R. at 374.) She would experience pain in some of her joints "all the time" and rated the joint pain a 7 out of 10. (R. at 375.) She stated that repetitive grasping, gripping, and holding would be painful, and described experiencing a "burning" sensation in her joints. (*Id.*) She reported having difficulty "standing and walking for extended periods of time," as well as "difficulty squatting and kneeling fully and repetitively." (*Id.*) Pushing, pulling, bending, stooping, squatting, and similar physical activities were be painful, and her back pain limited her ability to sit, stand, and walk. (*Id.*)

Dr. Panjwani noted that Plaintiff was diagnosed with seizures in 2003. (R. at 375.) She was prescribed Dilantin, which successfully controlled her seizure activity, as her last seizure occurred in March 2014. (*Id.*) She stated that after experiencing a seizure, she would be disoriented and confused, and would generally feel weak and tired. (*Id.*) Plaintiff also had been experiencing numbness and tingling on the left side of her face and lips and upper extremities. (*Id.*) She had not been working since January 2014, and would avoid driving unless "absolutely necessary." (*Id.*) She

reported experiencing "on and off dizziness," shortness of breath on overexertion, and occasional nausea, vomiting and coughing. (*Id.*) Her blood pressure was 146/98. (R. at 377.)

During her physical examination, Plaintiff was not able to bend down fully. (R. at 378.) She had discomfort and pain to her knees and back with squatting. (*Id.*) She was able to stand and walk on her toes and heels and could walk in a straight line. (*Id.*) She had mild crepitus in both of her knees and appeared to have some swelling of the metacarpophalangeal joints in the first two fingers of her right hand. (*Id.*) She did not appear to have any problems with her hearing, speech, or fine finger activities. (R. at 380.) Dr. Panjwani's impressions of Plaintiff were: (1) Lupus/arthritis with joint pains and low back pain; (2) grand mal seizures with a history of Chiari malformation, which could be related to underlying Lupus; (3) numbness to the left side of her face and upper extremities with unclear etiology, and (4) history of depression, high blood pressure, and some visual difficulties. (R. at 378-79.)

On June 3, 2014, Plaintiff underwent a psychological consultative examination with Dr. Christina "Niki" Ryser. (R. at 384-90.) Dr. Ryser noted that Plaintiff appeared truthful and provided sufficient information for an accurate assessment of history and functioning. (R. at 384.) Plaintiff reported problems with depression, headaches, and difficulty concentrating. (*Id.*) She struggled emotionally because she was young and had worked her whole life to support her children, but now had to "depend on them to do things for [her]." (*Id.*) She described sadness, crying spells, loss of interest and pleasure, decreased appetite, decreased sleep, lower energy, indecisiveness, difficulty concentrating, feelings of guilt and worthlessness, and suicidal ideation. (R. at 385.) She attempted to overdose on her medication during the prior week but stopped when her daughter "walked in." (*Id.*) Her depression had not improved, and her symptoms had started interfering with her ability

to work since September 2013.  (*Id.*)  She had never visited with a psychiatrist before but had been prescribed psychotropic mediation by her primary care physician.  (*Id.*)  Plaintiff described her current health problems as "uncontrolled hypertension, causing ruptures in [her] vessels in [her] brain, causing white spots," and seizures, which last occurred in March 2014.  (*Id.*)

Plaintiff had a normal gait and posture and was "appropriately talkative." (R. at 386.)  Dr. Ryser noted that she presented no clear evidence of a formal thought disorder, and her thought processes appeared coherent. (*Id.*)  She denied any current suicidal ideation or having any excessive or unreasonable fears.  (R. at 386-87.)  She "exhibited affect congruent with irritable/depressed mood" and "fairly good" orientation skills; being "limited" in abstract reasoning; exhibiting "somewhat limited" memory and concentration skills; and being "somewhat limited" in judgment and insight. (R. at 387-88.) Plaintiff reported impaired ability to perform activities of daily living. (R. at 388.)  She would avoid social situations but denied having a history or pattern of interpersonal problems with family, friends, bosses, or coworkers. (R. at 389.)  Dr. Ryser noted that Plaintiff presented as "irritable and somewhat depressed," and she had "some difficulties with tasks involving attention and concentration, as evidenced by being unable to correctly answer some things, requiring some repetition, and taking more time than expected to do [] other things." (*Id.*) She also appeared to have "some deficits with memory." (*Id.*)

Dr. Ryser opined that Plaintiff's current levels of depressive symptoms would cause her to have greater difficulty with attending and concentrating when focusing for extended periods of time or having to multi-task. (R. at 389.)  Also, when experiencing greater depressive symptoms, Plaintiff "may have difficulty being persistent in completing tasks, may take even more time than expected to complete tasks, or may have trouble finishing tasks altogether." (*Id.*) She noted that while Plaintiff

might appear capable of carrying out simple one or two-step instructions, Plaintiff would likely experience "difficulty managing detailed or complex instructions, as well as understanding and remembering, at times, and especially for a sustained time period." (*Id.*) Dr. Ryser believed that Plaintiff's current symptoms would impact her ability to maintain employment because of her difficulties in "staying focused and keeping up with the duties required of some jobs." (*Id.*) The diagnostic impression was major depressive disorder (single episode, moderate) and pain disorder associated with both psychological factors and a general medical condition, and she was assessed with a GAF score of 53. (R. at 390.) Her prognosis appeared "fair," provided that she sought and complied with psychiatric and psychotherapeutic interventions. (*Id.*)

Plaintiff visited Dr. Juan Campos, M.D., between June 2014 and September 2014. (R. at 392-402.) On June 9, 2014, she reported memory problems and depression. (R. at 396.) She had right lumbar spine pressure (radiculopathy) and was assessed with Lupus, chronic microvascular disease, depression, weight gain, and chronic lower back pain. (R. at 396.) On July 21, 2014, she complained of bilateral arm numbness and left elbow pain. (R. at 394.) She exhibited reduced hand grip and was assessed with hypertension, Lupus, seizure disorder, Chiari malformation, anxiety, depression, obesity, and arm and hand numbness. (*Id.*) On September 2, 2014, Plaintiff complained of experiencing shortness of breath, dizziness, and having suicidal thoughts. (R. at 393.) Her mood assessment score was a 30/30, which indicated severe depression. (*Id.*) She was assessed with depression, anxiety, hypertension, dizziness (vertigo), insomnia, nausea and vomiting, hallucinations, left below ankle pain, seizure disorder, and Chiari malformation. (*Id.*)

On July 3, 2014, state agency medical consultant (SAMC) Dr. Matthew Snapp, Ph.D, completed a Psychiatric Review Technique (PRT) for Plaintiff. (R. at 65-67.) He noted that

Plaintiff had an affective disorder and found that she was moderately limited in maintaining concentration, persistence, and pace. (R. at 65.) Dr. Snapp also found that Plaintiff was mildly restricted in activities of daily living and maintaining social functioning, and had no episodes of decompensation. (*Id.*) Dr. Snapp opined that her allegations were "not supported." (R. at 66.)

Dr. Snapp also completed a Mental Residual Functional Capacity Assessment. (R. at 67-69.) He found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in routine work setting. (R. at 68-69.) He also found that she was markedly limited in her ability to carry out detailed instructions. (R. at 68.) Dr. Snapp opined that Plaintiff could understand, remember, and carry out simple instructions; sustain concentration, persistence and pace on simple tasks; and adjust to simple changes in the work routine. (R. at 69.)

SAMC Yvonne Post, D.O., completed a Physical Residual Functional Capacity Assessment for Plaintiff on July 2, 2014. (R. at 66-68.) Dr. Post opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push and/or pull without limitations, other than shown for lift and/or carry. (R. at 66-67.) She also opined that Plaintiff's allegations were "not supported." (R. at 66.)

On December 16, 2014, Plaintiff presented to Parkland for a safety assessment. (R. at 425-54.) She reported suicidal ideation and admitted to superficially cutting her right wrist. (R. at 434.) She was depressed because of her worsening medical condition and not being able to work and

described visual hallucinations of small animals running around and hearing voices inside her head that she could not understand. (R. at 435.) She was diagnosed with severe major depression and assessed a GAF score of 41-50. (R. at 440, 452.)

On December 29, 2014, Plaintiff returned to Parkland, complaining of headaches. (R. at 455-62.) She described them as "throbbing," and she would hear tinnitus when laying down. (R. at 457.) She was diagnosed with abnormal MRI of head, history of seizure, and migraines. (R. at 456, 461.)

On December 30, 2014, Plaintiff presented to Lifenet Texas (Lifenet) for an initial psychological evaluation. (R. at 504-05.) She reported experiencing depression, anxiety, and hallucinations. (R. at 504.) She also reported feeling irritable with mood swings and would "want to pick fights with people and start arguing." (R. at 505.) Her history of attempted suicide was noted. (*Id.*) She was assessed with bipolar I (most recent episode mixed and severe with psychotic features), posttraumatic stress disorder (PTSD), and generalized anxiety disorder (GAD), and assessed a GAF score of 43. (R. at 505.)

On January 21, 2015, Plaintiff returned to Parkland for headaches. (R. at 464-66.) She reported feeling "more depressed since [T]hanksgiving," but denied having any plans to end life. (R. at 465.) She was observed as being anxious, depressed, and tearful, and was diagnosed with headaches. (R. at 466.)

On January 30, 2015, Plaintiff presented to Lifenet for a follow-up appointment. (R. at 510-11.) She reported being very anxious and complained of depression, anxiety, irritability, and fragmented sleep. (R. at 510.) She appeared initially agitated during the interview, but calmed down as it progressed. (*Id.*)

On February 3, 2015, Plaintiff presented to Parkland for a rheumatology examination. (R.

at 479-84.) She reported developing joint pain and overall "burning" type pain that had been worsening for the past two years. (R. at 481.) Her pain and other associated symptoms had made it difficult for her and caused her to be very anxious and depressed. (*Id.*) She reported fevers, nausea, vomiting, fatigue, dyspnea, tinnitus, headaches, and "memory problems due to concentration." (*Id.*) She also reported peri-oral tingling and numbness, as well as "tingling and radicular pain down both arms with associated lateral forearm numbness for the past year." (*Id.*) She presented multiple symptoms of arthralgia and tenderness and was diagnosed with SLE. (R. at 484.) A February 25, 2015 ultrasound of Plaintiff's abdomen showed fatty liver, and she had elevated liver function tests (LFTs). (R. at 486-88.)

On February 6, 2015, Dr. Leela Ready, M.D., affirmed Dr. Snapp's mental RFC assessment of Plaintiff. (R. at 79.) Likewise, Dr. Kim Rowlands, M.D., affirmed Dr. Post's physical RFC assessment on February 3, 2012. (R. at 81.)

On March 2, 2015, Plaintiff presented to Parkland for a neurology follow-up visit regarding her seizures. (R. at 492.) She reported that her depression continued being "out of control," and she "had to call the adult crisis line because she felt very [depressed] and began cutting herself." (*Id.*) She continued experiencing migraines three times a week, but described them as being "more tolerable." (*Id.*) She last experienced a seizure in March 2014, but it was unclear whether her seizures were epileptic or not epileptic. (R. at 496.) She was diagnosed with spells, and her prescription for Topamax was increased. (R. at 491, 496.)

On April 10, 2015, Plaintiff presented to Lifenet for a follow-up appointment. (R. at 513-14.) She complained of depression as well as irritability, hopelessness, and helplessness. (R. at 514.) She had been diagnosed with fibromyalgia and reported being mad and disappointed with life. (*Id.*)

On April 19, 2015, Plaintiff presented to Parkland for an MRI of her brain. (R. at 499-501.) The MRI study showed low-lying cerebellar tonsils, which was consistent with Plaintiff's history of Chiari type I malformation. (R. at 500.) Other "intracranial findings" were noted as "unremarkable." (*Id.*)

On June 12, 2015, Plaintiff returned to Lifenet for a follow-up visit. (R. at 516-17.) She stated that her physical symptoms would consume her and made her feel depressed. (R. at 517.) She was assessed with depression related to chronic condition. (*Id.*)

On June 30, 2015, Plaintiff presented to Parkland for a rheumatology follow-up examination. (R. at 540-45.) She reported experiencing pain at the anterior chest and posterior neck; upper extremity muscle aches; numbness and tingling in upper extremities; chronic back pain; lower extremity myalgia; pain that was burning in nature, and persistent fatigue. (R. at 542.) She was observed as having "typical fibromyalgia features," but there was not enough evidence to support a diagnosis of SLE. (*Id.*) She was reported as having "poorly controlled depression and mood disorder" and was assessed with fibromyalgia, incomplete Lupus, depression and mood disorder, and elevated Creatine Phosphokinase (CPK) with no muscle weakness. (*Id.*)

On August 14, 2015, Plaintiff returned to Lifenet for a follow-up visit. (R. at 519-20.) She reported that she felt "really bad" and "stuck." (R. at 520.) She also reported anxiety, nervousness, depressive symptoms, insomnia, mood swings, irritability, impulsive behavior, racing thoughts, restlessness, difficulty concentrating, anhedonia, and auditory hallucinations. (*Id.*) She stated that she had "resorted to cutting" and needed an adjustment to her medications because they were not working. (*Id.*) She was assessed with depression, and adjustments were made with her psychotropic medication. (*Id.*)

Plaintiff continued receiving mental health treatment from Lifenet between August 31, 2015, and October 23, 2015. (R. at 524-36.) During each session, she was depressed and tearful but denied suicidal ideation. (*Id.*) She presented withdrawn behavior, signs of psychotic features, paranoid delusions, restricted affect, and avoidance. (R. at 527, 530.) She also displayed normal speech and attention, intact memory, fair insight and judgment, organized thought, and appropriate psychomotor skills. (*Id.*) She reported depression from loneliness and urges to cut herself. (R. at 525-26, 535-36.) Throughout this period, she was assessed with depression and continued taking psychotropic medication. (R. at 527-29, 531-32, 535-36.) On October 13, 2015, Plaintiff stated that she had been cutting her wrists to alleviate her anxiety since December 2014. (R. at 531.) Scars on her left wrist were observed. (*Id.*)

On October 9, 2015, Plaintiff went to Parkland for dizziness, including symptoms of vertigo spasms and fatigue. (R. at 548-551.) She denied any neurological symptoms or suicidal ideation. (R. at 549.) Her musculoskeletal examination was positive for myalgias and back and joint pain, and negative for falls and neck pain. (R. at 550.) She was diagnosed with essential hypertension, menorrhagia with regular cycle, back pain at L4-L5 level, and blurred vision. (R. at 548.)

On November 15, 2015, Plaintiff presented to Parkland for back pain. (R. at 559-63.) An MRI of her lumbar spine revealed disc desiccation and disc height loss at L3-4, as well as a few perineural cysts at the level of the S1 and S2 segments. (R. at 560.) The MRI impression was mild degenerative changes of the lumbar spine, which was most prominent at L3-4. (R. at 560-61.) Plaintiff was diagnosed with back pain at L4-L5 level. (R. at 562.)

On November 17, 2015, Plaintiff returned to Parkland for a general neurology follow-up for her seizures. (R. at 564-70.) She reported that her migraines continued to occur three times a week

and were four hours in duration, and she characterized them as "throbbing." (*Id.* at 566.) She experienced her "worst" headaches in the bilateral occipital area. (*Id.*) Other than with her neurological system, due to possible seizures and migraines, no additional abnormalities were found in Plaintiff's physical examination. (R. at 568-69.) It was noted that she would not be a good candidate for Electroencephalography or epilepsy monitoring unit admission, given the relative infrequency of her seizures. (R. at 569.)

On January 6, 2016, Plaintiff presented to the neurosurgery clinic of Parkland for an assessment of her Chiari malformation. (R. at 508.) She reported "significant headaches" on a near daily basis, which would be "triggered and worsened with activities such as sneezing, coughing, laughing, [and] bearing down," and she experienced nausea and vertigo during them. (*Id.*) She also reported pain in her lower back, arms, and legs, and stated that her hands would "lock up" most often during the night. (*Id.*) She denied any significant upper extremity weakness, sensory changes, or difficulty with gait. (*Id.*) A January 28, 2016 MRI study showed Chiari I malformation with abnormal CSF flow posterior to the cerebellar tonsils. (R. at 594.)

On January 26, 2016, Plaintiff underwent a physical therapy evaluation for her back due to postural dysfunction and mechanical low back pain/dysfunction. (R. at 588-90.) Her pain was aggravated when walking and lying flat on her back. (R. at 589.) She also reported increased pain with extension and anterior pelvic tilt and positive straight leg raising to the right. (*Id.*)

On February 2, 2016, Plaintiff returned to Lifenet for a routine follow-up appointment. (R. at 537-38.) She had run out of her mediation three months before and had been feeling depressed, irritable, and easily agitated. (R. at 538.) She presented withdrawn behavior, signs of psychotic features, paranoid delusions, restricted affect, and avoidance. (R. at 537.) She also displayed normal

13

speech and attention, intact memory, fair insight and judgment, organized thought, and appropriate psychomotor skills. (*Id.*) She had continued cutting herself, but denied suicidal ideation. (R. at 538.) Her assessment for depression was noted as "unchanged." (*Id.*)

On February 3, 2016, Plaintiff visited Parkland complaining of headaches and occasional vertigo and dizziness. (R. at 598-601.) Her Chiari I malformation diagnosis was confirmed, and she was scheduled for posterior Chiari decompression surgery. (*Id.*) She was advised that her headaches might not improve after the surgery. (R. at 600.) Plaintiff returned to Parkland on February 10, 2016, and was diagnosed with essential hypertension and blurred vision. (R. at 620-21.)

On March 8, 2016, Plaintiff presented to Parkland and underwent a suboccipital craniectomy and C1 laminectomy with intradual lysis of adhesions for Chiari I malformation. (R. at 658-84.) She was observed as doing well after the surgery and being "neurologically intact." (R. at 669, 680.) On discharge, she was instructed to avoid heavy pushing and pulling, or lifting greater than ten pounds. (R. at 673, 681.) She was also instructed to walk as much as possible. (*Id.*)

On March 22, 2016, Plaintiff returned to Parkland for a post-surgical appointment. (R. at 686-89. ) She reported doing well overall, with the exception of some nausea. (R. at 687.) She also reported no postural headaches, and it was noted that post-operative pain and headaches "seem[ed] to improve." (*Id.*)

On April 8, 2016, Plaintiff presented to Parkland for chest pain. (R. at 691-705.) She also reported neck and back pain, as well as dizziness and tingling. (R. at 694.) She denied any headaches or changes in her vision, however. (*Id.*) She had a normal affect and was not in distress. (R. at 695.) She was diagnosed with musculoskeletal chest pain. (R. at 703.)

On April 15, 2016, Plaintiff returned to Parkland for continued chest pain. (R. at 706-30.)

She also had shortness of breath, fatigue, and elevated blood pressure. (R. at 715.) She was tearful, and it was noted that she continued experiencing depression and anxiety. (R. at 714-15, 722.) She was assessed with possible pericardial cyst and unspecified chest pain, and her discharge diagnosis was costochondritis. (R. at 721-22, 724.)

On April 20, 2016, Plaintiff presented to the neurosurgery clinic at Parkland for a follow-up. (R. at 731-35.) She reported "doing okay from a surgical standpoint," and her preoperative occipital headaches had "greatly improved with surgery." (R. at 733.) She also reported "some chest tightness." (*Id.*) She was diagnosed with status-post craniotomy, costochondritis, and Chiari malformation. (R. at 732.)

On April 28, 2016, Plaintiff presented to Lifenet for anxiety. (R. at 737-40.) She had run out of medication, her anxiety had "gotten really bad," and she was cutting herself again. (R. at 737.) She reported mood swings, impaired sleep, hallucinations, and crying spells. (R. at 739.) She had a tearful affect, impaired memory and attention, and poor impulse control. (R. at 738-39.) She also presented with cooperative behavior, normal speech and psychomotor skills, intact memory, fair insight and judgment, and no signs of psychotic features. (*Id.*) Plaintiff returned to Lifenet on May 4, 2016, reporting "significant improvement" with her medication, including improved sleep. (R. at 741-42.)

### 3. Hearing Testimony

On May 11, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 31-58.) Plaintiff was represented by an attorney. (R. at 33.)

### a. *Plaintiff's Testimony*

Plaintiff testified that she had no education beyond completion of the ninth grade. (R. at 37.)

She was a warehouse worker from May 2010 to September 2010, picking and packing computer parts and standing more than eight hours a day. (R. at 37-38.) She was a billing coordinator for a home health company from October 2010 to January 2014, but stopped working because she got very ill. (*Id.*) She had experienced a couple of seizures, her blood pressure was very high and uncontrolled, and she also experienced significant pain and fatigue. (*Id.*) "[E]ven a normal conversation would have [her] shorted out of breath," and she would have "trouble completing [her] tasks and concentrating." (R. at 38-39.) She denied receiving any unemployment after she stopped working in January 2014. (R. at 39.)

Plaintiff experienced pain throughout her body, including her knees, hips, lower back, shoulders, and arms. (R. at 39.) When she was in pain, she would also experience numbness from her elbows to her hands. (*Id.*) She had been having "a new different kind of pain in [her] head" since the March 2016 surgery to decompress her Chiari malformation. (*Id.*) Weather changes would trigger the pain, which she said felt like being hit in the back of the head with a baseball bat. (*Id.*)

Plaintiff's pain would last "throughout the day," and she would have to take pain medication and muscle relaxers, which would make her nauseated, drowsy, and dizzy. (R. at 39-40.) Her pain would worsen when sitting for long periods or when standing for more than ten minutes. (R. at 40.) Occasionally, changing positions while being in a reclined position would relieve it. (*Id.*) She rated her pain at an eight on a scale of ten. (*Id.*) Dr. Thakur was her primary doctor, and she would go to Lifenet for psychiatric outpatient treatment. (R. at 41.) Her "last doctor" did not place her on any restrictions, but her previous doctors did have her on restrictions. (*Id.*) As of the date of the hearing, she had been taking Medroxyprogestrerone, Gabapentin, Methylprednisone, Promethazine, Promethazine, Rantidine, Tylenol 300, Codeine, Methocarbamol, Hydroxyzine, Magnesium,

Topiramate, Duloxetine, Amlodipine, Losartan, Ibuprofen, Quatiapine, Calcium D, and Cyanocobalamin. (R. at 41-42.) The Quatiapine, which she took for psychosis, would make her tired, lightheaded, and sleepy. (R. at 42.) The March 2016 surgery was her only recent surgery, and her last visit to the ER was for chest pain. (R. at 43.) She denied receiving any pain injections. (*Id.*) She had recently been diagnosed with "a pericardial cyst and pulmonary nodules and ostechondritis," which caused her to experience chest pain, tiredness, and shortness of breath. (R. at 44.)

Plaintiff was hospitalized at Parkland in December 2014 because she had cut her wrists. (R. at 44.) She had been seeking outpatient treatment at Lifenet for problems with her memory. (*Id.*) She had problems with conversations because she would get off topic and have trouble recalling "easy words." (*Id.*) She also experienced problems with maintaining attention and concentration, and her mind would wander when talking to people. (R. at 45.) She had difficulty understanding information and instructions and would need to re-read instructions multiple times before comprehending. (R. at 46.) She struggled with making decisions and would "snap" and "argu[e] with people for no reason." (*Id.*) She suffered from severe depression, anxiety, and mood swings and would relieve her anxiety by cutting herself. (*Id.* at 47.)

During a typical day, Plaintiff would nap for a few hours and be in a reclined position for most of the day. (R. at 47-48.) She would occasionally watch television and do easy household chores, like cleaning countertops. (R. at 48.) She would avoid activities that involved bending or standing for long periods due to her vertigo and fear of falling over. (*Id.*) Plaintiff could lift a gallon of milk at most; stand or walk for approximately 10 to 15 minutes at a time; and sit for short periods. (R. at 49-50.) If she sat too long, her lower back would start hurting and she would experience

numbness in her legs. (R. at 50.) Extreme temperature changes exacerbated her pain. (*Id.*) Her pain would interfere with her ability to pay attention and she struggled with finishing things she started. (R. at 50-51.) When her anxiety and pain was bad, she would cut herself and usually did it once a month. (R. at 51-52.) Even though her anxiety medication dosage had been increased, she continued to cut herself. (R. at 52.) She confirmed that she had been diagnosed as being bipolar with psychosis, depression, anxiety, and PTSD at Lifenet. (*Id.*)

### b.      VE's testimony

The VE characterized Plaintiff's past work for the past fifteen years as an order picker, which the Dictionary of Occupational Titles (DOT) classified as medium work with an SVP of 2; a billing coordinator, which the DOT classified as sedentary work with an SVP of 4; and an apartment manger, which the DOT classified as light with an SVP of 5. (R. at 54.)

The VE opined that a hypothetical individual with the same age, education, and work history as Plaintiff, who would be limited to the light exertional level and could never work near dangerous machinery and unprotected heights; understand, remember, and carry out simple instructions; sustain concentration, persistence, and pace on simple tasks; and adjust to simple changes in work routines, could not perform any of Plaintiff's past work. (*Id.*) This person could, however, perform jobs classified as "light" with an SVP of 2, including a housekeeping/cleaner, with about 136,080 jobs nationally and about 9,600 jobs in Texas; a cafeteria attendant, with about 59,640 jobs nationally and about 5,010 jobs in Texas; or a routing clerk, with about 40,520 jobs nationally and about 3,590 jobs in Texas. (*Id.*) The VE testified that her testimony was consistent with the DOT. (*Id.*)

The VE also opined that a second hypothetical individual with the same age, education, and work history as Plaintiff who could lift and carry and push and pull up to 20 pounds occasionally

and up to 10 pounds frequently; sit for six hours, and stand and walk for two hours in an eight-hour day with normal breaks; never work near dangerous machinery and unprotected heights; understand, remember, and carry out simple instructions; sustain concentration, persistence, and pace on simple tasks; adjust to simple changes in work routines; and have limited occasional incidental contact with coworkers and the general public could not perform any of Plaintiff's past work. (R. at 55-56.) The second hypothetical individual could perform jobs classified as "sedentary" with an SVP of 2, including a lens inserter, with about 217,500 jobs nationally and about 6,680 jobs in Texas; an addresser, with about 7,250 jobs nationally and about 950 jobs in Texas; or a document preparer, with about 45,670 jobs nationally and about 5,200 jobs in Texas. (*Id*.) The VE testified that her testimony was consistent with the DOT. (*Id*.) The second hypothetical individual would not be able to perform any work, including Plaintiff's past work, if that person could not sustain persistence and pace and would be off task 20% of the time. (R. at 56.) When asked whether that testimony was consistent with the DOT, the VE responded that "off-task time" was not addressed by the DOT and was based on her own experience. (R. at 57.)

The VE also testified that one of the jobs identified for the second hypothetical individual, production worker, had a pace requirement. (R. at 57.) The addresser and the document preparer "would just need to maintain pace," while the lens inserter "would have production requirements." (*Id*.) The "permissible time off task to still allow for competitive employment" would be 8% of the time. (*Id*.) The "permissible number of absences to still maintain competitive employment" was "[o]ne to two per month." (*Id*.)

## C.   ALJ's Findings

The ALJ issued his decision denying benefits on June 23, 2016. (R. at 10-30.) At step one,

the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 16, 2014, the alleged onset date. (R. at 15.) At step two, the ALJ found that she had the following severe impairments: SLE, essential hypertension, Chiari I malformation, history of seizure disorder, major depressive disorder, bipolar I disorder with psychotic features, PTSD, GAD, and obesity. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 18.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work, but included the following limitations: avoid exposure to dangerous machinery and unprotected heights; understand, remember, and carry out simple instructions; sustain concentration, persistence, and pace on simple tasks; adjust to simple changes in work routines; and have occasional, incidental contact with coworkers and the general public. (R. at 20.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (R. at 23.) At step five, the ALJ found that transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (R. at 24.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from January 16, 2014 through June 23, 2016. (R. at 25.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and

terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.  RESIDUAL FUNCTIONAL CAPACITY

Plaintiff presents only one issue for review: "The ALJ's RFC finding is not supported by substantial evidence." (doc. 17 at 5.)  She argues that the ALJ "failed to properly accommodate Plaintiff's limitations restricting her ability to sustain any mental or physical work-related activities for extended periods of time."  (*Id.* at 7.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. at § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. at § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he

does not specifically discuss all the evidence that supports her decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

## A.    <u>Mental Limitations</u>

Plaintiff first contends that the medical evidence supports a mental RFC that limits her from performing "sustained work" on a "regular and continuing basis." (doc. 17 at 7-8, 17-19.)

Here, the ALJ considered Plaintiff's mental limitations when determining her RFC and found that she could understand, remember, and carry out simple instructions; could sustain concentration, persistence, and pace on simple tasks; could adjust to simple changes in work routines; and be limited to occasional, incidental contact with coworkers and the general public. (R. at 20.) The ALJ noted and directly considered the medical records from Parkland and Lifenet, the opinions of Dr. Ryser and the SAMCs, and Plaintiff's GAF scores.

Dr. Ryser noted that Plaintiff might have difficulty with attending and concentrating "when

she must focus for extended periods of time," and would likely "have difficulty managing detailed or complex instructions, as well as understanding and remembering, at times, and especially for a sustained time period." (R. at 389.)  Dr. Ryser assessed her with a GAF score of 53. (R. at 390.)  Dr. Ryser also noted that Plaintiff appeared to be able to carry out simple one or two-step instructions. (R. at 389.)  Dr. Ryser further noted that Plaintiff had only recently begun treatment with antidepressant medication and opined that with appropriate psychiatric and psychotherapeutic interventions, "she [might] have the opportunity to experience symptom alleviation (emotionally), to the point she [would be] able to consistently re-engage in gainful employment, in a position commensurate to her ability/function level." (R. at 389-90.)  The ALJ afforded great weight to Dr. Ryser's opinions because they were consistent with the record, especially Plaintiff's "examinations showing impaired attention."  (R. at 22.)

The ALJ also considered the opinions of the SAMCs regarding Plaintiff's capacity to perform work activities. (R. at 22.)  On both initial review and reconsideration, the SAMCs opined that Plaintiff could understand, remember, and carry out simple instructions; sustain concentration, persistence, and pace on simple tasks; and adjust to simple changes in the work routine. (R. at 69, 83.)  The ALJ noted that the SAMCs cited to medical evidence, and their opinions were "largely consistent with the record."  (R. at 22.)  Nevertheless, he only attributed partial weight to the SAMCs' opinions because they failed to adequately consider Plaintiff's subjective complaints.  (*Id.*) The ALJ also referenced Plaintiff's GAF[2] scores of 41-53 and acknowledged that they were consistent for an individual suffering with a manifested mental disorder. (R. at 22-23, 390, 440, 443,

---

[2]A GAF score between 41 and 50 is classified as "reflecting serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Boyd v. Apfel*, 239 F.3d 698, 702 (5th Cir. 2001).

505). He attributed little weight to those scores because they contradicted the record as a whole regarding Plaintiff's ability to function in occupational and social settings. (R. at 23.) He further noted the inherent limitations of a GAF score, which "only show[ed] the claimant's mentality at a specific time." (*Id.*)

Plaintiff argues that the ALJ failed to account for her inability to perform "sustained work," which was a limitation consistent with Dr. Ryser's opinion and her GAF scores. (doc. 17 at 17.) As noted, her mental RFC was limited to understanding, remembering, and carrying out *simple instructions*; sustaining concentration, persistence, and pace on *simple tasks*; and adjusting to *simple changes* in work routines. (R. at 20.) Dr. Ryser actually opined that Plaintiff could carry out simple one or two-step instructions, but would have difficulty managing, understanding, and remembering "detailed or complex instructions . . . especially for a sustained time period." (R. at 389.) In other words, she would only be unable to perform sustained work involving detailed or complex instructions, tasks, and changes. (*Id.*) Because the RFC was limited to work involving simple instructions, tasks, and changes, it is consistent with Dr. Ryser's recommended restrictions, as well as with the opinions of the SAMCs. Further, the ALJ attributed little weight to Plaintiff's GAF scores, and considering the record as a whole, found the scores to be an unreliable gauge of her "ability to function in occupational and social settings." (R. at 22-23.) Accordingly, the ALJ's decision to afford little weight to Plaintiff's GAF scores is supported by substantial evidence in the medical record. *See Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *6 (N.D. Tex. Mar. 25, 2011) (noting that "the GAF scale does not directly correlate to an individual's ability or inability to work"); *see also Nickerson v. Astrue*, No. 3:07-CV-0921-BD, 2009 WL 321298 at *6 (N.D. Tex. Feb. 6, 2009) (observing that "a low GAF score is not determinative of a disability").

Substantial evidence exists to support the ALJ's findings on Plaintiff's mental limitations in the RFC, as the ALJ considered the medical evidence in the record, including the records of Parkland and Lifenet, as well as the opinions of Dr. Ryser and the SAMCs. As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) 158 F. App'x at 535 (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. To the extent that Plaintiff complains of the failure to include more restrictive mental limitations in the RFC, the ALJ did not err, and remand is not required on this issue.

## B.   Physical Limitations

Plaintiff next contends that the ALJ failed to properly accommodate for her physical impairments, which limited her ability to sustain any physical work activities for extended periods. (doc. 17 at 7.)

Here, the ALJ determined that Plaintiff retained the physical RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567,[3] with no exposure to dangerous machinery and unprotected heights. (R. at 20.) He explained that her "subjective pain and limitations have been duly recognized and considered in the residual functional capacity [in] an appropriate manner." (R. at 22.) He referenced her testimony that she could walk for one block before needing to rest, and could only

---

[3] Although the ALJ cited 20 C.F.R. § 404.1567(b), the definition of sedentary work is actually found under § 404.1567(a):

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

remain standing for ten minutes because of her pain, and acknowledged her testimony that she was able to prepare simple meals and do laundry. (R. at 20-21, 48-50.)

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. at 21.) He noted that multiple physical examinations of Plaintiff failed to show any "abnormalities explanatory of [her] proposed limitations." (R. at 21, 258-71, 287, 304-05, 317, 319, 340, 342, 344, 364, 367, 373, 374-82, 425, 427-28, 480, 483, 492-96, 544, 546, 550, 566, 569, 581, 594, 600, 665-66, 670, 673, 680, 695, 697-98.) Although her reports of headache pain were supported by the record, the ALJ underscored the fact that her headache symptoms had been reduced after she underwent surgery for Chiari I malformation. (R. at 21, 666, 670, 673, 680, 692, 695.) The ALJ also noted that there was no evidence of muscle atrophy in the record, despite the fact that "muscle atrophy is a common side effect of prolonged or chronic pain due to lack of use of muscle in order to avoid pain." (R. at 22, 367, 492-93, 495-96, 544, 546, 550.) He highlighted the fact that there were no medical opinions stating that Plaintiff was "unable to work or an assessment of what activities [she could] still perform supporting such a conclusion." (R. at 21.) While the ALJ recognized that Plaintiff did experience limitations as a result of her physical impairments, when considering the record in its entity, he determined that her symptoms did not rise to her alleged severity. (R. at 22.)

The ALJ considered the medical evidence in the record, including records from Parkland, when determining Plaintiff's physical RFC. (*See* R. at 15-18, 21-22.) Moreover, the absence of objective factors indicating the existence of prolonged or chronic pain (e.g., no evidence of muscle

atrophy), further justifies the conclusions of the ALJ. *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987). Because he relied on medical evidence in the record in making his RFC determination, his assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is therefore not required on this basis.

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 7th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE